**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| Eaton Corporation, | ) CASE NO.: 1:20-CV-893 |
| | ) |
| Plaintiff, | ) JUDGE: |
| | ) |
| vs. | ) |
| | ) **COMPLAINT** |
| Angstrom Automotive Group, LLC and | ) |
| Wrena, LLC, | ) |
| | ) |
| Defendants. | ) **JURY TRIAL DEMANDED** |

Plaintiff Eaton Corporation ("Eaton"), for its Complaint against Angstrom Automotive Group, LLC ("Angstrom") and Wrena, LLC ("Wrena") (collectively, "Defendants"), states as follows:

## INTRODUCTION

1. To maximize their own profits, Defendants ignored their contractual obligations by manufacturing and supplying defective metal levers—critical components in Eaton's automated electric clutch actuation clutches, which are used in the transmissions of large commercial vehicles.

2. Eaton repeatedly and explicitly informed Defendants in contracts, drawings, written specifications, computer models, and other communications that a critical bend in the lever must be "full round"; that is, it needed to be circular and avoid any sharp corners or jagged edges. Only levers with a "full round" bend could withstand the forces necessary to shift gears without breaking. Defendants understood the importance of the "full round" directive: for years, they supplied levers with the requisite shape that functioned properly.

3.      Defendants altered their maintenance procedures, which resulted in levers containing numerous sharp edges resembling microscopic mountain ranges within the area that was required to be "full round".  These edges became focal points for the powerful forces acting on the levers during their operation. Defendants' decision to cut corners caused Eaton's clutches to fail in the field when the defective levers snapped from fatigue because they did not meet specifications.

4.      As a result, Eaton incurred significant expenses totaling tens of millions of dollars addressing warranty claims and conducting a field service campaign to repair and replace clutches.

5.      Eaton brings claims against Defendants for breach of the governing Master Purchase Agreement ("MPA") and Purchase Orders ("POs").  Eaton also asserts claims for breach of express warranty, breach of the implied warranty of merchantability, and breach of the implied warranty of fitness for a particular purpose.  Eaton seeks compensatory damages (including consequential damages), costs, and attorneys' fees in an amount to be proven at trial.

## PARTIES

6.      Eaton is incorporated in the State of Ohio and its principal place of business is in Ohio.

7.      Angstrom is a Michigan limited liability company and its principal place of business is located at 26980 Trolley Industrial Drive, Taylor, Michigan, 48180.  Upon information and belief, Angstrom's members are citizens of Michigan and not citizens of Ohio.

8.      Angstrom supplies numerous parts and components to original equipment manufacturers ("OEMs") and Tier 1 suppliers in the automotive and trucking industries.  Angstrom was founded in 1999 by an experienced automotive engineer who had previously spent a decade as an engineer for large automotive companies.  Angstrom is a vertically integrated supplier of automotive and trucking products with multiple locations across the United States and a broad

range of capabilities through individual business units, including Defendant Wrena.  In addition to manufacturing, Angstrom and its business units provide project management, prototyping, and engineering services facilitated by their experienced technical experts.

9.      Wrena is a Michigan limited liability company.  It operates a manufacturing facility at 265 Lightner Rd, Tipp City, OH 45371.  Upon information and belief, Angstrom is Wrena's sole member.  Wrena is one of Angstrom's business units and was acquired by Angstrom in 2011. Wrena specializes in manufacturing structural stampings, heavy truck parts, plastic insert molds, fabricated assemblies, welded assemblies, and clutch assemblies for the automotive and trucking industries.  Wrena supplies metal stampings to dozens of customers in the automotive and trucking industries from its 110,000-square-foot manufacturing facility.

## JURISDICTION AND VENUE

10.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs. Eaton is a citizen of Ohio, and, upon information and belief, Defendants are citizens of Michigan.

11.      Angstrom regularly conducts business with customers and affiliates in Ohio by selling products in Ohio to Ohio entities and by maintaining its affiliates' facilities in the state.

12.      Wrena conducts business in Ohio and manufactures products in the state.

13.      Defendants knowingly subjected themselves to personal jurisdiction in Ohio by executing the MPA and fulfilling POs with Ohio-based Eaton.  The levers at issue in this case were manufactured in Ohio.  Further, the MPA contains a forum selection clause that provides that it "is made under and shall be construed in accordance with the law and *in the courts of* the place where Eaton has its principal place of business," which is Ohio.

14.     Venue is appropriate in this District pursuant to 28 U.S.C. §§ 1391 and 1404(a) because Defendants have sufficient contacts to be subject to personal jurisdiction and a substantial amount of the activity giving rise to this matter took place in this District.

## FACTUAL BACKGROUND

I.     **DEFENDANTS AGREE TO MANUFACTURE LEVERS FOR EATON'S ECA CLUTCHES.**

15.     Eaton is a global diversified intelligent power management and technology company that is a leading supplier of heavy- and medium-duty truck transmissions and clutches. Among other products, Eaton produces automated electric clutch actuation ("ECA") clutches. ECA clutches are unique: they work with Eaton's automated transmissions to actively, smoothly shift gears based on changing operating conditions and allow heavy- and medium-duty trucks to seamlessly start and stop by temporarily disconnecting the engine from the vehicle's drive train. ECA clutches also allow disengagement from the transmission, which enables truck engines to run while the vehicle stands still.  Eaton sells its ECA clutches to prominent OEMs.

16.     Each ECA clutch contains six levers that work in unison to temporarily disconnect the engine from the drive train so the transmission can shift gears.

17.     The levers in Eaton's ECA clutches are metal tongues that are bent or "coined" to create a semi-cylindrical indentation referred to as a "hotdog."  "Coining" is a specific metal fabrication method in which the workpiece—in this case, a lever—is stamped between a punch and die.  The punch is applied to the lever under high pressure to bend the lever and create an indentation which meshes with other parts of the ECA clutch.

4



18.     The shape of the lever—particularly the hotdog—is essential to its proper functioning.  To withstand the pressure imposed by the ECA clutch's springs, the hotdog must be round so the applied force is evenly distributed across its arched surface.  Jagged edges, sharp corners, or other irregularities within the hotdog act as "stress risers"—areas of concentrated force—that can fracture part of the lever, leading to various mechanical problems, including difficulty shifting gears, harsh gear engagement, clutch slippage, incomplete clutch departure, and various fault codes and service lamp illuminations.  Faulty levers can also damage other parts of the ECA clutch, leading to other modes of failure.

19.     To avoid these expensive failures, Eaton requires adherence to detailed specifications, drawings, models, and approved samples.

**a.  Angstrom Executes Master Purchase Agreement With Eaton.**

20.     Angstrom and Eaton executed the MPA effective August 30, 2016.  (Attached hereto as **Ex. A**.)  The MPA provides that Angstrom will supply Eaton with clutch levers bearing Part Number 173c147 at a price of $0.8363 per unit for a total estimated volume of 954,000 units.

21.     Under the MPA, Angstrom could perform its obligation to supply Eaton through an affiliated business unit such as Wrena.

22.     Angstrom exercised that option and Eaton's POs were fulfilled by Wrena, which manufactured levers at its Ohio facility.

23.     The POs incorporated Eaton's Terms and Conditions.  (See Blanket PO 52689 attached hereto as **Ex. B**.)

24.     The MPA incorporates Eaton's General Terms and Conditions ("Terms and Conditions") by reference.  (Ex. A, MPA § 1.3; the Terms and Conditions are attached hereto as **Ex. C**.)

25.     As such, Defendants were both subject to the Terms and Conditions through their respective agreements with Eaton.

26.     Neither the MPA nor the Terms and Conditions limit Eaton's right to collect damages.

27.     Defendants warranted that the levers were safe and appropriate for use in the ECA clutches:

Seller warrants that:

(a) The items:
    (1) Are free from defects in material, workmanship and design,
    (2) Are of merchantable quality and fit for Buyer's purposes,
    (3) Conform with Buyer's instructions, specifications, drawings
    and data, and
    (4) Conform to all representations, affirmations, promises,
    descriptions, samples, or models provided by Seller to Buyer.

(Ex. C, Terms and Conditions § 7.1.)

28.     Eaton relied on these express warranties and expected Defendants to supply levers that met specifications.

6

29.     None of Defendants' express or implied warranties were disclaimed:

> Seller's warranties survive acceptance of the items. These warranties are in addition to any warranties of additional scope given by Seller to Buyer. None of these warranties and no implied or express warranties are disclaimed or excluded unless evidenced by a purchase order change notice or revision issued and signed by Buyer.

(Ex. C, Terms and Conditions § 7.2.)

30.     The Terms and Conditions also prohibit Defendants from altering the lever's design or the manufacturing process unless they obtained Eaton's prior written approval: "All items are to be completely interchangeable with like items purchased from Seller previously by Buyer or Buyer's customer. To this end, Seller must use the same designs, processes, or procedures used by Seller in supplying like items previously. Seller may not make any change to any of its designs, processes, or procedures without Buyer's prior written approval. If Seller does not comply with this Article, Seller is liable for all of Buyer's costs associated with the noninterchangeable items." (Ex. C, Terms and Conditions § 8.)

31.     Additionally, the Terms and Conditions require Defendants to indemnify Eaton against losses suffered by Eaton as a result of orders executed under the MPA.  (Ex. C, Terms and Conditions § 13.)

> **b. Eaton Instructs Defendants to Manufacture the Levers' Coined Area As "Full Round" Through Its Print Specifications and Computer-Aided Design Model.**

32.     To ensure the levers functioned properly in the ECA clutches, Eaton supplied Defendants with written specifications, drawings, and computer models emphasizing that the hotdog needed to be "full round."

33.     The print specification for the part, Print 173C147 Rev AE, provides, amongst other things:

- The lever's coined area must be "full round."

7

- An instruction to "blend radii" of the lever's coined area.
- The lever's coined area shall have "no sharp corner."
- Any radii not specified shall be ".120".

These requirements defined Angstrom's obligations under the MPA and Wrena's obligations under the POs.  In fact, they are the very specifications and drawings Defendants warranted they would adhere to in the Terms and Conditions.

34.    Further, Eaton furnished Defendants with a detailed Computer-Aided Design ("CAD") model of the lever.  Amongst other things, Eaton's CAD model stated that the radius for the coined bend should be at least .05" ensuring full roundness:



Between the various instructions in the written specifications and the parameters of the CAD model, it was clear that the hotdog was to be fully round.

### c.    Eaton Approves Defendants' Sample Parts Meeting Specifications.

35.    To qualify as an Eaton supplier, Defendants were required to manufacture and provide initial sample levers featuring full round coining.  This process is called the Production Part Approval Process ("PPAP") and it is customary in the automotive and trucking industries to qualify suppliers and determine if sub-components meet specifications.

36.    The objective of the PPAP is to provide the end-manufacturer with an opportunity to efficiently evaluate the parts and fabrication processes of its suppliers prior to the initiation of

full-scale production. Once the supplier and its processes pass the PPAP, the recipient of the parts can be reasonably assured that all future shipments will conform to the approved samples, and that the underlying manufacturing process flow will not be altered without notice.  As sophisticated, long-time suppliers of components in the automotive and trucking industries, Defendants were well-acquainted with the PPAP, its significance, and their resulting obligations.

37.     Per the PPAP, Defendants provided Eaton with sample levers along with data about the levers and a detailed description of their manufacturing processes.  Critically, the sample levers were *full round*.  Eaton analyzed the samples and subjected them to testing, concluding that they satisfied specifications.  Eaton, relying on the samples' conformance to specifications, approved the part and authorized full-scale production.

38.     After that point, according to both industry standard practice and Section 8 of the Terms and Conditions, Defendants were required to inform Eaton of any changes in the lever's dimensions or the processes used to manufacture the same.

39.     Defendants never provided any such notice.

## II.     DEFENDANTS CUT CORNERS AND MANUFACTURE DEFECTIVE LEVERS.

40.     Prior to late 2017, Defendants provided Eaton with hundreds of thousands of levers that apparently met the full round specification.

41.     Upon information and belief, to manufacture levers meeting the full round specification, Defendants needed to perform periodic maintenance on their coining equipment, including frequently sharpening and recalibrating the dies in their machines.

42.     Upon information and belief, this continual tool maintenance was time-consuming and expensive.

43.     Upon information and belief, sometime in late 2016 or early 2017, Defendants unilaterally decided to change their maintenance practices, which had been to sharpen the die after

every production run, and instead perform such maintenance less frequently.  Defendants failed to inform Eaton of this material change before implementing it.

44.     Upon information and belief, Defendants' secret alterations to the maintenance procedures were ineffective and counterproductive.  The stamping machines, dies, and other tools needed to create a fully round hotdog degraded over time, becoming increasingly inaccurate.  Consequently, rather than "full round" coining of the hotdog, the levers shipped to Eaton contained hotdogs with bends that were misshapen, warped, tattered, and jagged.  The hotdogs contained miniature mountain ranges of microscopic peaks and valleys, ill-suited for carrying loads and susceptible to failure.

45.     These undisclosed defects were not perceptible to the naked eye without additional testing, and Eaton continued to use the levers in its clutch assemblies, acting under the erroneous belief that Defendants were honoring their contractual duties.

46.     No one from either Angstrom or Wrena gave Eaton any reason to believe Defendants were failing to honor their contractual duties.

47.      In February 2018, Australian trucking customers began reporting ECA clutch failures in the field.  Eaton inspected certain malfunctioning ECA clutches under magnification and found that the levers deviated from specifications.

48.     On February 5, 2018, Eaton issued a Defective Material Report ("DMR") for Defendants' faulty levers.  Eaton re-issued the DMR on May 1, 2018 after additional testing.

49.     The May 2018 DMR stated that the clutch lever lacked material transition in the hotdog because the lever's radii were not blended pursuant to Eaton's print specifications.

50.     In response to the DMR, Wrena advised Eaton that it would revise its control plan (which documents the functional elements of quality control that must be implemented to assure

quality standards are met) to include inspections of the hotdogs and to test three levers per hour using a radius gage.

51.     Eaton still found incorrect levers in shipments from May 27, 2018 despite the enhanced control plan.

52.     Eaton continued testing Defendants' levers and determined levers manufactured from the period between November 2017 and March 2018 were significantly outside of specifications.  The hotdogs of the defective levers were so shallow and jagged that they failed after a short period of use.

53.     Eaton's analysis concluded that between April 2017 and June 2018, defective levers were incorporated into approximately 79,102 ECA clutches that Eaton sold.

54.     Below is a visual comparison of a compliant lever from August 2016 with one of the defective levers from March 2018.  As is clear from these magnifications of the hotdog, the faulty clutch levers suffered from: (1) jagged edges in violation of the print specifications; (2) hotdogs that were not "full round" in violation of the print specifications; and (3) radii that were incorrect and were not blended in violation of the print specifications.

**Coined Area Meeting Eaton Specifications**

**Coined Area NOT Meeting Eaton Specifications**




55.     ECA clutch field failures grew as an increasing number of defective levers broke under strain.

56.     During its analysis and investigation of the failures, Eaton regularly communicated its findings to Defendants verbally, in writing and in person.  Eaton specifically informed Defendants in 2018 that the ECA clutch malfunctions were attributable to levers that Defendants manufactured outside of specifications.

57.     Upon information and belief, once Eaton discovered the source of the lever failures in mid-2018 and communicated its conclusions to Defendants, Defendants immediately reinstated their previous manufacturing and maintenance procedures, which enabled Defendants to once again produce levers with "full round" hotdogs.

58.     Eaton attempted to convene various meetings with Defendants to discuss why the levers failed.  Defendants delayed, cancelled, or truncated these meetings.  Moreover, despite repeated good faith requests, Defendants refused to share maintenance records for its tools and other relevant documentation.

## III.    EATON SPENDS MILLIONS ON A FIELD SERVICE CAMPAIGN TO REMEDIATE DEFENDANTS' DEFECTIVE LEVERS.

59.     Defendants' faulty levers dramatically impacted Eaton's business.  There are several outcomes when a sufficient number of levers in any given ECA clutch fail, including, but not limited to:  (1) the clutch can no longer generate the force necessary to disengage the engine from the drive train; (2) the transmission cannot effectively shift gears while the truck is in motion; (3) idling trucks might lurch forward unexpectedly; or (4) shrapnel from broken levers can damage other portions of the clutch and the engine.

60.     Eaton began repairing or replacing clutches impacted by Defendants' defective levers.

61.     On December 7, 2018, Eaton initiated a campaign to install software updates to approximately 79,102 trucks with ECA clutches that were at risk of malfunctioning due to Defendants' defective levers.  The software update eliminated the risk that a stationary truck could creep forward while idling.

62.     On December 12, 2018, Eaton issued a service bulletin identifying fault codes and clutch release errors caused by broken levers.  The service bulletin encouraged drivers to replace ECA clutches manufactured between April 1, 2017 and June 20, 2018 under the standard warranty process.

63.     In December 2019, Eaton commenced a proactive clutch replacement campaign for all 25,560 clutches made between November 2017 and March 2018.

64.     Eaton consistently confirmed in its publicly-filed submissions and reports that the clutch failures were caused by the faulty levers Defendants supplied.  For example, in National Highway Traffic Safety Administration report 18V-931, Eaton offered the following explanation: "The stamping die for the pressure plate lever was improperly maintained by the stamping supplier, causing the bend (coin) radius on the stamped pressure plate levers to be out of specification."

65.     To date, Eaton has spent tens of millions of dollars fixing problems caused by Defendants' breach of their contractual obligations, including both software-installation costs and hardware repair and replacement expenses.  Eaton expects to spend tens of millions more through the end of 2021, if not longer.

66.     Furthermore, Eaton has incurred and continues to incur expenses storing the voluminous clutches it has replaced.  Eaton has warehoused the replaced clutches in order to substantiate its damages and preserve evidence potentially relevant to this case.

67.    Defendants deny any responsibility for the lever failures and the damages Eaton sustained as a result.

**COUNT I**
**BREACH OF CONTRACT**
**(AGAINST ANGSTROM)**

68.    Eaton hereby re-alleges and incorporates by reference Paragraphs 1-67 of this Complaint as if fully set forth herein.

69.    Eaton performed all its obligations and satisfied all conditions precedent under the MPA.

70.    The Terms and Conditions incorporated into the MPA require Angstrom to provide clutch levers that: "(1) Are free from defects in material, workmanship and design, (2) Are of merchantable quality and fit for Buyer's purposes, (3) Conform with Buyer's instructions, specifications, drawings and data, and (4) Conform to all representations, affirmations, promises, descriptions, samples, or models provided by Seller to Buyer."  (Ex. C, Terms and Conditions §7.1.)

71.    The Terms and Conditions also provide that Angstrom must indemnify Eaton against any losses related to Eaton's purchase of products from Defendants.  (Ex. C, Terms and Conditions § 13.)

72.    Angstrom supplied defective levers to Eaton that: (a) were not "full round"; (b) were improperly coined; (c) contained jagged edges and sharp corners; (d) did not have a sufficient minimum coining radius or appropriately blended radii; (e) could not pass the required testing protocols; (f) did not conform to the CAD model provided by Eaton; (g) did not conform to the PPAP samples submitted by Defendants; (h) broke and otherwise failed at high rates in the field; and (i) caused damage to ECA clutches, engines, and other truck parts.

14

73.     Angstrom therefore breached the MPA because it:

- Did not provide clutch levers that were free from defect in material and workmanship;
- Did not provide clutch levers of merchantable quality for Eaton's purposes;
- Did not conform with Eaton's instructions, specifications, or drawings; and
- Did not conform to Defendants' own samples and representations.

74.     Angstrom further breached the Terms and Conditions by altering the lever designs, manufacturing processes, and maintenance procedures without Eaton's prior written consent.

75.     Moreover, Angstrom is obligated to indemnify Eaton for the losses it has suffered to date and any that it will incur in the future relating to the defective levers.

76.     As a result of the lever defects, Eaton was forced to spend tens of millions of dollars replacing or repairing faulty clutches and installing software.

77.     As a direct and proximate result of Angstrom's failure to meet the enumerated requirements of the MPA, Eaton sustained damages including but not limited to the following: 1) expenditures to replace or repair the failed ECA clutches and install remedial software; 2) expenditures to investigate the clutch lever problems; 3) loss of revenues, sales, and profits; 4) harm to Eaton's business reputation; 5) diminished goodwill among purchasers and potential purchasers of Eaton's ECA clutches; 6) loss of customers; 7) attorneys' fees and costs; 8) labor and storage costs associated with maintaining failed ECA clutches; and 9) other losses arising from Defendants' breach not otherwise specified herein.

**COUNT II**
**BREACH OF CONTRACT**
**(AGAINST WRENA)**

78.      Eaton hereby re-alleges and incorporates by reference Paragraphs 1-77 of this Complaint as if fully set forth herein.

79.     For each lot of levers, Eaton and Wrena entered into a PO.

80.    All sales of levers were made pursuant to such a PO.  Each PO incorporated Eaton's Term and Conditions by reference.

81.    Eaton performed all its obligations and satisfied all conditions precedent under each PO.

82.    The Terms and Conditions incorporated into the POs require Wrena to provide clutch levers that:  "(1) Are free from defects in material, workmanship and design, (2) Are of merchantable quality and fit for Buyer's purposes, (3) Conform with Buyer's instructions, specifications, drawings and data, and (4) Conform to all representations, affirmations, promises, descriptions, samples, or models provided by Seller to Buyer."  (Ex. C, Terms and Conditions §7.1.)

83.    The Terms and Conditions also provide that Wrena must indemnify Eaton against any losses related to Eaton's purchase of products from Defendants.  (Ex. C, Terms and Conditions § 13.)

84.    Wrena supplied defective levers to Eaton that: (a) were not "full round"; (b) were improperly coined; (c) contained jagged edges and sharp corners; (d) did not have a sufficient minimum coining radius or appropriately blended radii; (e) could not pass the required testing protocols; (f) did not conform to the CAD model provided by Eaton; (g) did not conform to the PPAP samples submitted by Defendants; (h) broke and otherwise failed at high rates in the field; and (i) caused damage to ECA clutches, engines, and other truck parts.

85.    Wrena therefore breached the POs because it:

- Did not provide clutch levers that were free from defect in material and workmanship;
- Did not provide clutch levers of merchantable quality for Eaton's purposes;
- Did not conform with Eaton's instructions, specifications, or drawings; and
- Did not conform to Defendants' own samples and representations.

86.     Wrena further breached the Terms and Conditions by making alterations to the lever designs, manufacturing processes, and maintenance procedures without Eaton's prior written consent.

87.     Moreover, Wrena is obligated to indemnify Eaton for the losses it has suffered to date and any that it will incur in the future relating to the defective levers.

88.     As a result of the lever defects, Eaton was forced to spend tens of millions of dollars replacing or repairing faulty clutches and installing software.

89.     As a direct and proximate result of Wrena's failure to meet the enumerated requirements of the POs, Eaton sustained damages including but not limited to the following: 1) expenditures to replace or repair the failed ECA clutches and install remedial software; 2) expenditures to investigate the clutch lever problems; 3) loss of revenues, sales, and profits; 4) harm to Eaton's business reputation; 5) diminished goodwill among purchasers and potential purchasers of Eaton's ECA clutches; 6) loss of customers; 7) attorneys' fees and costs; 8) labor and storage costs associated with maintaining failed ECA clutches; and 9) other losses arising from Defendants' breach not otherwise specified herein.

## <u>COUNT III</u>
## BREACH OF EXPRESS WARRANTY, O.R.C. § 1302.26
## (AGAINST ALL DEFENDANTS)

90.     Eaton hereby re-alleges and incorporates by reference Paragraphs 1-89 of this Complaint as if fully set forth herein.

91.     All sales of levers were made pursuant to the MPA, the POs, and the incorporated Terms and Conditions.

92.     In the Terms and Conditions, Defendants expressly warranted that the clutch levers: "(1) Are free from defects in material, workmanship and design, (2) Are of merchantable quality

and fit for Buyer's purposes, (3) Conform with Buyer's instructions, specifications, drawings and data, and (4) Conform to all representations, affirmations, promises, descriptions, samples, or models provided by Seller to Buyer." (Ex. C, Terms and Conditions §7.1.)

93. Contrary to these express warranties, Defendants' levers: (1) did not conform to Eaton's specifications and drawings because, amongst other things, they were not "full round" and instead contained jagged edges; (2) did not conform to the CAD model provided by Eaton because, amongst other things, they did not have sufficient radii or blended radii; (3) did not conform to the samples provided by Defendants themselves during the PPAP process because, amongst other things, they were not "full round" and instead contained jagged edges and insufficient radii; (4) were not of a merchantable quality because, amongst other things, they failed in the field and caused damage to ECA clutches, engines, and other truck parts; (5) were not free from defects; and (6) otherwise violated the express warranties.

94. As a direct and proximate result, Eaton sustained damages including, but not limited to, the following: 1) expenditures to replace or repair the failed ECA clutches and install remedial software; 2) expenditures to investigate the clutch lever problems; 3) loss of revenues, sales, and profits; 4) harm to Eaton's business reputation; 5) diminished goodwill among purchasers and potential purchasers of Eaton's ECA clutches; 6) loss of customers; 7) attorneys' fees and costs; 8) labor and storage costs associated with maintaining failed ECA clutches; and 9) other losses arising from Defendants' breach not otherwise specified herein.

### COUNT IV
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY, O.R.C. § 1302.27
### (AGAINST ALL DEFENDANTS)

95. Eaton hereby re-alleges and incorporates by reference Paragraphs 1-94 of this Complaint as if fully set forth herein.

96.     Eaton is a "buyer" as that term is defined by § 1302.01(A)(1) of the Ohio Revised Code.

97.     Defendants are "sellers" as that term is defined by § 1302.01(A)(4) of the Ohio Revised Code.

98.     Angstrom, Wrena, and Eaton are "merchants" as that term is defined by § 1302.01(A)(5) of the Ohio Revised Code.

99.     Defendants impliedly warranted to Eaton that the clutch levers supplied would be merchantable under § 1302.27 of the Ohio Revised Code.

100.    By supplying Eaton with defective and/or non-conforming clutch levers that, amongst other things, were not "full round" and failed in the field, Defendants breached their implied warranty that the goods would be merchantable under § 1302.27 of the Ohio Revised Code.

101.    As a direct and proximate result, Eaton sustained damages including, but not limited to, the following: 1) expenditures to replace or repair the failed ECA clutches and install remedial software; 2) expenditures to investigate the clutch lever problems; 3) loss of revenues, sales, and profits; 4) harm to Eaton's business reputation; 5) diminished goodwill among purchasers and potential purchasers of Eaton's ECA clutches; 6) loss of customers; 7) attorneys' fees and costs; 8) labor and storage costs associated with maintaining failed ECA clutches; and 9) other losses arising from Defendants' breach not otherwise specified herein.

## <u>COUNT V</u>
## BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, O.R.C. § 1302.28
## (AGAINST ALL DEFENDANTS)

102.    Eaton hereby re-alleges and incorporates by reference Paragraphs 1-101 of this Complaint as if fully set forth herein.

103.    Eaton is a "buyer" as that term is defined by § 1302.01(A)(1) of the Ohio Revised Code.

104.    Defendants are "sellers" as that term is defined by § 1302.01(A)(4) of the Ohio Revised Code.

105.    Angstrom, Wrena, and Eaton are "merchants" as that term is defined by § 1302.01(A)(5) of the Ohio Revised Code.

106.    Defendants impliedly warranted to Eaton that the clutch levers supplied would be fit for their particular purpose—inclusion in as a defect-free critical component of the ECA clutch— under § 1302.28 of the Ohio Revised Code.  As experienced suppliers of automotive and trucking parts who maintained regular contact with Eaton and others in the industry, Defendants knew that their levers would be incorporated into Eaton's ECA clutches.

107.    By supplying Eaton with defective and/or non-conforming clutch levers that, amongst other things, were not "full round" and failed in the field, Defendants breached their implied warranty of fitness for a particular purpose under § 1302.28 of the Ohio Revised Code.

108.    As a direct and proximate result, Eaton sustained damages including but not limited to the following:  1) expenditures to replace or repair the failed ECA clutches and install remedial software; 2) expenditures to investigate the clutch lever problems; 3) loss of revenues, sales, and profits; 4) harm to Eaton's business reputation; 5) diminished goodwill among purchasers and potential purchasers of Eaton's ECA clutches; 6) loss of customers; 7) attorneys' fees and costs; 8) labor and storage costs associated with maintaining failed ECA clutches; and 9) other losses arising from Defendants' breach not otherwise specified herein.

WHEREFORE, Eaton prays that the Court award it:

1. Damages in an amount to be determined at trial, but in no event less than or equal to $75,000 exclusive of costs and interests;

2. Reasonable attorneys' fees, interest, and costs;

3. Any other relief the Court deems just and equitable.

## JURY DEMAND

Plaintiff Eaton Corporation demands a jury trial on all claims, counterclaims, defenses, and other issues so triable.

Date: April 24, 2020          Respectfully submitted,

*/s/  Joseph A. Castrodale*

JOSEPH A. CASTRODALE (0018494)
GREGORY J. PHILLIPS (0077601)
BENESCH, FRIEDLANDER, COPLAN &
ARONOFF LLP
200 Public Square
Cleveland, Ohio 44114
Telephone: 216.363.4500
Facsimile: 216.363.4588
Email: jcastrodale@beneschlaw.com
gphillips@beneschlaw.com

NICHOLAS J. SECCO (6275881)
LALLY A. GARTEL (6309056)
ASHLEIGH MORPEAU (6321167)
BENESCH, FRIEDLANDER, COPLAN &
ARONOFF LLP
*pro hac vice to be filed*
71 South Wacker Drive, Suite 1600
Chicago, Illinois 60606-463771
Telephone:  312.212.4949
Facsimile:  312.767.9192
Email:  nsecco@beneschlaw.com
          lgartel@beneschlaw.com
          amorpeau@beneschlaw.com

*Attorneys for Plaintiff Eaton Corporation*