UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

EATON CORPORATION,              )
                                )    CASE NO.  1:20-cv-893
    Plaintiff/Counter-Defendant,   )
                                )
    v.                          )    JUDGE BRIDGET MEEHAN BRENNAN
                                )
                                )
ANGSTROM AUTOMOTIVE GROUP,       )    **MEMORANDUM OPINION**
LLC and WRENA, LLC,              )    **AND ORDER**
                                )
    Defendants/Counter-Plaintiffs.  )


Eaton Corporation ("Eaton") filed suit in this Court against Angstrom Automotive Group,
LLC ("Angstrom") and Angstrom's subsidiary Wrena, LLC ("Wrena" and, collectively with
Angstrom, "Defendants").  (Doc. No. 1.)  Defendants answered and filed counterclaims.  (Doc.
No. 41.)  Eaton filed a motion for partial summary judgment as to liability on its own claims and
Defendants' counterclaims.  (Doc. No. 81.)  Defendants filed a combined motion for both
judgment on the pleadings and summary judgment on Eaton's claims.  (Doc. Nos. 69, 86.)[1]

I.    **Facts**

    A.    **Undisputed Matters**

The following facts were admitted by both sides in pleadings or were not disputed in the
summary judgment submissions.

Eaton manufactures automated electric clutch actuation ("ECA") clutches, as well as
other non-ECA clutches, which Eaton sells to original equipment manufacturers ("OEMs").

---

[1] All motions are fully briefed.  (*See* Doc. Nos. 78, 82, 83, 84.)

1

(Doc. No. 1 at 4, ¶ 15; Doc. No. 41 at 284, ¶ 15.)[2]  Each ECA clutch contains six levers that work in unison to temporarily disconnect the engine from the drive train so the transmission can shift gears.  (Doc. No. 1 at 4, ¶ 16; Doc. No. 41 at 284, ¶ 16.)

A lever is fabricated by stamping or punching flat metal between a punch and a die. (Doc. No. 1 at 4, ¶ 17; Doc. No. 41 at 284, ¶ 17.)  A tool and die "punch" process creates the "S" curve shape shown below.  (*See* Doc. No. 78 at 1454-55; Doc. No. 83 at 2132-34, 2136, 2139.) At the lower bend, the concave side is called the "hot dog."  (*See* Doc. No. 69-2 at 868-69; Doc. 77-2 at 1120; Doc. No. 83-1 at 2178; Doc. No. 83-10 at 2240, 2242.)  Opposite the hot dog, on the other side of the metal, the convex side of the metal is called the "fulcrum."  (*See* Doc. No. 69-2 at 868-69; Doc. 77-2 at 1120; Doc. No. 83-1 at 2178; Doc. No. 83-10 at 2240, 2242; Doc. No. 77-1 at 1105-06.)



(*See, e.g.*, Doc. No. 83-4 at 2204.)  Wrena specializes in manufacturing structural stampings, heavy truck parts, and clutch assemblies for the automotive and trucking industries.  (Doc. No. 1 at 3, ¶ 9; Doc. No. 41 at 283, ¶ 9.)

---

[2] For ease and consistency, record citations are to the electronically stamped CM/ECF document and PageID# rather than any internal pagination.

In 2005, Eaton outsourced the production of No. 173c147 levers ("147 Levers") to Wrena (*f/k/a* Wren Industries).  (Doc. No. 41 at 300, ¶¶ 3-4; Doc. No. 42 at 316, ¶¶ 3-4.)  Eaton provided Wrena with design and manufacturing specifications, drawings, and models for making 147 Levers.  (Doc. No. 41 at 300-01, ¶¶ 4-8.)  That same year, the parties conducted a production part approval process ("PPAP").  (Doc. No. 1 at 8, ¶ 35; Doc. No. 41 at 287, ¶ 35.)  The objective of a PPAP is to provide a manufacturer (Eaton) with an opportunity to evaluate the fabrication process of a supplier (Wrena) and to inspect sample parts before the initiation of full-scale part production.  (Doc. No. 1 at 8-9, ¶ 36; Doc. No. 41 at 288, ¶ 36.)

During the PPAP, Wrena provided Eaton with an acceptable sample of 147 Levers and warranted that it was capable of manufacturing 147 Levers.  (Doc. No. 1 at 9, ¶ 37; Doc. No. 41 at 288, 300, ¶¶ 37, 6; Doc. No. 42 at 316, ¶ 6.)  Eaton admits that at the outset Wrena used proper dies and molds to make the 147 Levers.  (Doc. No. 42 at 316, ¶ 4.)  Eaton approved Wrena and its sample levers during the PPAP.  (Doc. No. 41 at 288, 301, ¶¶ 37, 7; Doc. No. 42 at 316, ¶ 7.)  Eaton and Wrena also agreed upon a control plan for quality checks.  (Doc. No. 41 at 300-01, ¶¶ 5, 8; Doc. No. 42 at 316, ¶¶ 5, 8.)  Wrena produced 147 Levers and other parts at its Ohio facility.  (Doc. No. 1 at 3, 6, ¶¶ 9, 12, 22; Doc. No. 41 at 283, 285, ¶¶ 12, 22.)

Angstrom acquired Wrena in 2011.  (Doc. No. 41 at 301, ¶ 9.)  On August 25, 2016, Eaton and Angstrom executed a new contract titled the Master Purchase Agreement, which became effective on August 30, 2016 (the "2016 Agreement").  (Doc. 1-1 at 25, 28, § C.1.4; Doc. No. 41 at 285, ¶ 20 (admitting the accuracy and authenticity of Doc. No. 1-1).)  The 2016 Agreement permitted Angstrom's affiliate Wrena to continue supplying parts ordered by Eaton.  (Doc. No. 77-3 at 1130, §§ B, C.1.1; *see also* Doc. No. 41 at 283, ¶ 9.)  Pertinent terms of the 2016 Agreement are summarized below.

Section 1.3 stated that the 2016 Agreement is "the entire agreement between the Parties and incorporates Eaton's General Terms and Conditions . . . [and] supersedes all previous agreements and understandings between the Parties and takes precedence over any other terms and conditions that may be stated on any Supplier documentation."  (Doc. No. 1-1 at 25.)

Section 7.1 of those Terms and Conditions warranted that the supplier's products:

(1)   Are free from defects in material, workmanship and design,

(2)   Are of merchantable quality and fit for Buyer's purposes,

(3)   Conform with Buyer's instructions, specifications, drawings and data, and

(4)   Conform to all representations, affirmations, promises, descriptions, samples, or models provided by Seller to Buyer.

(Doc. No. 1-3 at 40.)  Section 8 of the Terms and Conditions required that component parts all be made the same way:

All items are to be completely interchangeable with like items purchased from Seller previously by Buyer or Buyer's customer.  To this end, Seller must use the same designs, processes, or procedures used by Seller in supplying like items previously.  Seller may not make any change to any of its designs, processes, or procedures without Buyer's prior written approval.  If Seller does not comply with this Article, Seller is liable for all of Buyer's costs associated with the non-interchangeable items.

(*Id.* at 41.)  Section 6.4 of the 2016 Agreement set forth a process in the event of "non-conformance," which included issuance of a written "defective material report (DMR)."  (Doc. No. 1-1 at 26.)

Under Section 6.6, a supplier must "provide to Eaton technological / engineering support for new product design and product development."  (*Id.*)  Relatedly, Section 4.2 provided that "Supplier shall consistently strive to work together with Buyer in order to achieve cost reductions via productivity gains throughout the term of the Agreement."  (*Id.* at 25)

4

Section 8.1 provided that "[t]he cost of all special tooling required to produce the Product shall be quoted in a full breakdown and billed to Eaton upon achieving PPAP.  Eaton shall own the tooling special tooling [sic] once the tooling PO contract is fulfilled through payment against the order."  (*Id.* at 27.)  Section 10.1 of the Terms and Conditions defined "special tooling" to include "all dies, fixtures, molds, patterns, special cutting tools, special gauges, . . . and drawings and any replacements of the foregoing; acquired, manufactured, or used in the . . . production of the items or parts" ordered.  (Doc. No. 1-3 at 41.)  Section 10.2 required a supplier to "keep the special tooling in good condition fully covered by insurance, and must replace it when lost, destroyed, or necessary for performance of work under this order."  (*Id.*)

Section 9.1 of the 2016 Agreement provided: "All notices or other communications which are required or permitted under Agreement shall be in writing and shall be deemed to be sufficiently given if by registered or certified mail, postage prepaid, and addressed . . ." for Eaton to its Legal Department and for Defendants to Raj Banga at Angstrom.  (Doc. No. 1-1 at 27.)  Section 9.1 further provided that "[e]ither Supplier or Eaton may, by written notice given hereunder, designate a different address to which subsequent notices or other communications shall be sent."  (*Id.* at 28.)

Section 22 of the Terms and Conditions addressed disagreements:

A party may request a meeting to resolve a dispute related to this order.  Following the request, the parties:

(a)    Must meet promptly to attempt in good faith to resolve the dispute,

(b)    Must use their best efforts to select and implement in a timely manner an alternative dispute resolution ("ADR") procedure (e.g., mediation) to resolve the dispute, if the dispute is not resolved within 30 days after the meeting, and

(c)    May take any other action (e.g., litigation) to resolve the dispute, if:

(1)    The parties are unable to agree upon a form of ADR within 15 days

after the 30-day negotiation period, or

(2)     The dispute is not resolved by the ADR, and

(3)     In either case a party notifies the other of its intention seven days before beginning legal proceedings.

(Doc. No. 1-3 at 46.)

Section 7.1 of the 2016 Agreement stated that "Angstrom will be a supplier of 125891 Roller Yoke for Eaton's next gen transmission (50% share beginning in 2020 for a period of 5 years), Angstrom will continue to be the sole supplier of the A-8133 Roller Yoke."  (Doc. No. 1-1 at 26.)  Under Section 7.2, "Eaton Corporation agrees to allow Angstrom to quote all of the available projects for stampings, aluminum die cast products, and precision machined parts at any time during the length of the contract."  (*Id.* at 26-27.)  Additional business opportunity covenants followed, with the caveat in Section 7.5 that "[t]hese reasonable efforts shall be contingent on Angstrom's continued performance as outlined in this agreement."  (*Id.* at 27.)

## B.     Disputed Subjects

In February 2018, Eaton first alerted Defendants to reports of clutch failures that it ascribed to the 147 Levers.  (Doc. No. 1 at 10, ¶ 47; Doc. No. 41 at 289, ¶¶ 47-48.)  Over two years later, on April 24, 2020, Eaton filed this lawsuit.  (Doc. No. 1 at 21.)  The parties contest one another's interpretation of what occurred in 2018 and 2019.  (*See, e.g.*, Doc. Nos. 1, 41.)  Below are facts related to some of the events that occurred during that period.  These facts pertain to the Court's rulings below.

On February 2, 2018, Eaton emailed Defendants the following:

We're receiving feedback of failures in the field involving this component. Please see the attached PPT.  I am awaiting definitive measurement results on this, but a formal DMR will be issued next week for this nonconformance.  You can visually see that these parts are not meeting our print specifications.  I wanted to inform you of what is transpiring so that you have time to determine the root cause (possibly a cracked form punch) and implement corrective actions

6

as soon as possible.  Let me know if you have any questions, but as I stated, a formal notification will be issued next week.

(Doc. No. 81-13 at 1916.)  The parties then embarked on two months of communications and evidence-gathering focused on the 147 Levers.  (*See* Doc. No. 81-15 (compiling email communications).)  Initially, Defendants insisted that their products were made to specification and demanded proof of a defect.  (*See id.* at 1932-34.)  On February 14, 2018, Eaton withdrew its first DMR, though it expressed ongoing concerns and asked Defendants to repair or refine the tool and die machinery used to create the 147 Levers.  (*Id.* at 1931-32.)

On April 3, 2018, Eaton emailed Defendants to report more failures with the 147 Levers and request Defendants' manufacturing data.  (*Id.* at 1931.)  That led to a series of efforts to ascertain whether the manufacturing process for the 147 Levers could be improved.  (*See* Doc. No. 81-15.)

Eaton's Exhibit S is a timeline of its notes and perspective regarding interactions with Defendants with respect to the 147 Levers.  (Doc. No. 81-19.)  On September 5, 2018, Eaton's timeline indicated that the parties disagreed about whether the levers were defective:

> Discussion was focused around the print and the "full round" call out that Eaton had been seeing failures on.  Wrena denounced the call out and questioned if it was properly labeled/dimensioned or tolerance on the print.  Wrena also took the path that they built to print.  They also referenced the change that had been implemented in May of 2018.  Obvious conflict of interpretation [*sic*] was present.  Parties agreed that further investigation and discussion was needed to address and solve the issue.

(*Id.* at 1958.)

On November 5, 2018, a conference call was held between the parties where Eaton advised Defendants of an upcoming recall involving clutches with the 147 Levers.  (*Id.*)  On March 18, 2019, company leaders met face-to-face and discussed warranty issues related to the Levers.  (*Id.* at 1959.)

7

On March 27, 2019, the parties executed a new contract, which became effective on April 1 (the "2019 Agreement").  (Doc. No. 77-25 at 1404, 1408.)  Section 10.1 provided: "The execution of this Agreement shall in no way impact any potential claims of either Party which may exist or have existed" under the 2016 Agreement.  (*Id.* at 1407.)  This section also expressly preserved the "Warranty, Indemnity, Insurance, Tooling . . . and Remedies" provisions from the 2016 Agreement.  (*Id.*)

According to the timeline, executives met face-to-face on July 16, 2019.  (Doc. No. 81-18 at 1959.)  During that meeting, Eaton contended that there had been tool and die maintenance problems, while Defendants said that the problem was with Eaton's design for the 147 Levers.  (*Id.*)  On September 18, 2019, an onsite meeting was held at Wrena's manufacturing plant.  (*Id.*)  According to Eaton's timeline, Eaton personnel posed queries and requested materials and access to the machinery, but Wrena declined some of those requests.  (*See id.*)  According to an internal Wrena email a few days later, "[t]he main purpose [of Eaton's requests were to] potentially develop a case for directing warranty responsibility to Angstrom."  (Doc. No. 78-23 at 1650.)

### C.  Summary of Claims

The parties agree that their contracts and claims are governed by Ohio law.  (*See* Doc. No. 78 at 1466, 1469; Doc. No. 81 at 1690, 1696-98; Doc. No. 83 at 2142, 2145, 2148; Doc. No. 86 at 2668, 2672.)

Eaton's lawsuit is based on the 147 Levers.  (*See* Doc. No. 1.)  In Counts One and Two of Eaton's Complaint, it contends that Angstrom and Wrena breached the 2016 Agreement.  (Doc. No. 1 at 14-17.)  In Count Three, Eaton contends that Defendants breached the express warranties referenced in their Agreement.  (*Id.* at 17-18.)  In Count Four, Eaton pleads that

Defendants breached the implied warranty of merchantability.  (*Id.* at 18-19.)  In Count Five, Eaton raises the implied warranty of fitness for a particular purpose.  (*Id.* at 19-20.)

Defendants' Counterclaims take aim at Eaton's business practices and tactics in 2018 and 2019.  (*See* Doc. No. 41 at 299-314.)  In Counterclaim One, Defendants allege that Eaton induced Angstrom to enter into the 2019 contract by affirmatively misleading Angstrom into believing Eaton had no pending claims against Angstrom and that the 2019 Agreement resolved all existing claims that either party had against the other as of the date thereof.  (*Id.* at 309.)  Alternatively, Eaton intentionally failed to disclose that it intended to assert such a claim against Defendants.  (*Id.*)  Eaton intended for Angstrom to rely on its fraudulent misrepresentations and/or silence to induce Angstrom to sign the 2019 contract.  (*Id.* at 310.)  As relief, they seek to have the 2019 agreement voided and the 2016 contract reinstated.  (*Id.*)

Counterclaim Two contends that Eaton breached the Yoke exclusivity obligation in the 2016 Agreement.  (*Id.* at 310-11.)  Counterclaim Three contends that Eaton acted in bad faith and breached its duties under that Agreement to afford business opportunities to Defendants.  (*Id.* at 311-12.)  Counterclaim Four seeks declaratory relief, holding that Defendants did not change their manufacturing process and that the 147 Levers were not defective.  (*Id.* at 312-14.)  Defendants also seek a declaratory judgment excusing further performance with the 2016 and 2019 Agreements.  (*Id.* at 313.)

## II.     Law and Analysis

### A.     Standard of Review

"A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories,

and affidavits show there is no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law.  The moving party bears the burden of showing that no

genuine issues of material fact exist."  *Williams v. Maurer*, 9 F.4th 416, 430 (6th Cir. 2021)

(citations and quotations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986);

*Mining Mach., Inc. v. Copley*, 145 F. App'x 149, 152 (6th Cir. 2005) ("The moving party bears

the initial burden of informing the court of the basis for its motion and identifying those portions

of the record that establish the absence of a genuine issue of material fact.").

A "material" fact is one that "might affect the outcome of the suit under the governing

law."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  And a genuine dispute of

material fact exists if the evidence is such that a reasonable jury could return a verdict for the

non-moving party.  *Abu-Joudeh v. Schneider*, 954 F.3d 842, 849-50 (6th Cir. 2020) (citations and

quotations omitted).

"Once the moving party satisfies its burden, the burden shifts to the nonmoving party to

set forth specific facts showing a triable issue of material fact."  *Queen v. City of Bowling Green,*

*Kentucky*, 956 F.3d 893, 898 (6th Cir. 2020) (quotation and citations omitted).  "[O]n summary

judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light

most favorable to the party opposing the motion."  *Id*.; *see also Kalamazoo Acquisitions, L.L.C.*

*v. Westfield Ins. Co.,* 395 F.3d 338, 342 (6th Cir. 2005).

A party asserting or disputing a fact must cite evidence in the record or show that the

record establishes either the absence or the presence of a genuine dispute.  *See* Fed. R. Civ. P.

56(c) & (e).  Rule 56 further provides that "[t]he court need consider only" the materials cited in

the parties' briefs.  Fed. R. Civ. P. 56(c)(2); *see also Street v. J.C. Bradford & Co.*, 886 F.2d

1472, 1479-80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.").

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, the Court's role is not to make credibility determinations or "weigh" conflicting evidence. *Payne v. Novartis Pharms. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014); *Arban v. W. Publ'g Corp.*, 345 F.3d 390, 400 (6th Cir. 2003). "The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Payne*, 767 F.3d at 530.

"The fact that both parties make motions for summary judgment, and each contends in support of his respective motion that no genuine issue of fact exists, does not require the Court to rule that no fact issue exists." *Begnaud v. White*, 170 F.2d 323, 327 (6th Cir. 1948). "It is true that both parties seek to resolve this case through the vehicle of cross-motions for summary judgment, but the standards upon which the court evaluates the motions for summary judgment do not change simply because the parties present cross-motions." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

When a plaintiff moves for summary judgment on its own claims, for which it carries the burden of persuasion at trial, the burden is high. The plaintiff must show the absence of material fact disputes on all of the essential elements of its claim. *See generally Surles v. Andison*, 678

F.3d 452, 455-56 (6th Cir. 2012) (citations and quotations omitted); *accord Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160 (5th Cir. 2021).  "Summary judgment in favor of the party with the burden of persuasion . . . is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

### B.      Counts One through Four of Eaton's Complaint

Both sides move for summary judgment on all claims in Eaton's Complaint.  Defendants' motion challenges the timing and the content (i.e., the reasonableness) of notice.  (Doc. No. 86 at 2668-71.)  "Eaton was required to give timely and reasonable notice of a warranty claim to Wrena before Eaton filed this lawsuit."  (*Id.* at 2655.)  Defendants say that "Eaton purposefully waited more than 2 years, until April 24, 2020, when it filed this lawsuit, before it sprung its $50 million claim on Wrena."  (*Id.* at 2656 (emphasis omitted).)

Eaton's motion for partial summary judgment seeks a determination that Defendants are liable on all claims in the Complaint.  Eaton contends, among other things, that Defendants had actual and constructive notice of their alleged breach(es).  (Doc. No. 81 at 1693-96.)  For the reasons below, both Rule 56 motions directed to Eaton's claims must be denied because there are genuine, material fact disputes surrounding notice.[3]

"Where a tender [of goods] has been accepted . . . the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy."  Ohio Rev. Code § 1302.65(C)(1).  That "bars a buyer from any remedy if he fails to notify the seller within a reasonable time after he discovers or should have discovered the breach."  *Jones v. Davenport*, No. 18162, 2001 WL 62513, at *8 (Ohio Ct. App.

---

[3] For reasons unrelated to notice, which are discussed later in this opinion, summary judgment will be entered on Count Five of Eaton's Complaint.

Jan. 26, 2001).  "The buyer must plead and prove the giving of notice of breach . . . [which] is a condition precedent to the buyer's cause of action."  4 Anderson U.C.C. § 2-607:21 (3d. ed.).

Ohio courts have rejected a "strict reading" of Section 1302.65(C)(1).  *See Coupled Prod., LLC v. Mod. Mach. Tool Co.*, No. 3:12CV2727, 2014 WL 293659, at *10 (N.D. Ohio Jan. 23, 2014).  Thus, "notice may be sufficient under the statute despite the fact that the notice does not specifically allege a breach of the contract.  Moreover . . . the statute was not meant to exclude the possibility that notice may be inferred."  *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 537 N.E.2d 624, 638 (Ohio 1989).  Testimony recounting meetings between the parties may be significant because "written notice is not required under R.C. 1302.65(C)(1), and in many circumstances oral notice of breach has been found sufficient."  *Id.*  Moreover, "no specific form or words are required in the notice of breach of contract."  *AGF, Inc. v. Great Lakes Heat Treating Co.*, 555 N.E.2d 634, 637 (Ohio 1990).

> The content of the notification need merely be sufficient to let the seller know that the transaction is troublesome and must be watched.  There is no reason to require that the notification which saves the buyer's rights under this section must include a clear statement of all the objections that will be relied on by the buyer, as under the section covering statements of defects upon rejection.  Nor is there reason for requiring the notification to be a claim for damages or of any threatened litigation or other resort to a remedy.  The notification which saves the buyer's rights under this Article need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation.

*Id.* at 636 (citations omitted; quoting U.C.C. § 2-607 Cmt. 4).

Ohio courts strongly favor juries over judges to determine whether notice was adequate.  *See, e.g.*, *Lincoln Elec. Co. v. Technitrol, Inc.*, 718 F. Supp. 2d 876, 881 (N.D. Ohio 2010).  "Whether notice is adequate and reasonable is generally a question of fact to be determined from the totality of the circumstances."  *Id.*  Similarly, "the determination of a reasonable time and the adequacy of notice to the seller are ordinarily questions of fact.  A trial court should be reluctant

13

to grant summary judgment on the grounds that notice of breach was untimely as a matter of law." *Chemtrol*, 537 N.E.2d at 636 (quotations and citations omitted).  Accordingly, "whether notice is reasonable is ordinarily a question for the jury." *Lincoln*, 718 F. Supp. 2d. at 883-84; *cf. Roth Steel Prod. v. Sharon Steel Corp.*, 705 F.2d 134, 154 n. 43 (6th Cir. 1983) ("Notice of breach given five months after breach is discovered, unlike notice given immediately, may not be timely in every circumstance.").

"This 'well-established rule' extends to the question of whether a buyer should have discovered a breach, and therefore should have given notice, earlier than they did." *Vexos, Inc. v. Ravin Elecs., LLC*, No. 1:19-cv-1529, 2021 WL 4813277, at *5 (N.D. Ohio Mar. 17, 2021). "It is true that, where the facts are undisputed and but one inference can be drawn therefrom as to the reasonableness of the notice, the question is one of law, but [a] trial court should be reluctant to grant summary judgment on the grounds that notice of breach was untimely as a matter of law." *Id.* (quotations and citations omitted); *see also Nathan v. Whirlpool Corp.*, 492 F. Supp. 3d 747, 757 (S.D. Ohio 2020).  "Because of the 'all circumstances' inquiry that is necessarily involved, the timeliness of notice under [Section] 1302.65(C)(1) . . . is ordinarily a question for the trier of fact." *Allen Food Prod., Inc. v. Block Bros.*, 507 F. Supp. 392, 394 (S.D. Ohio 1980).

In *Allen*, the court held that summary judgment on breach of warranty claims was precluded by two disputed fact issues:

> It remains unclear when notice of breach, adequate under O.R.C. § 1302.65(C)(1), was first given.  * * *  It remains uncertain when the period for timely notice from Plaintiff to Defendant commenced, or, in the statute's terms, when Plaintiff "should have discovered" Defendant's alleged breach of warranty with respect to the delivered goods.

*Id.*  Notably, the court recognized that the nature of the breach or product defect at issue might inform what constitutes timely notice.  *See id.*  If a problem with goods was discovered because

of complaints from the buyer's customers, it may be that the buyer should not have discovered the breach until those complaints came in. *Id.* at 395. Similarly, if the defective nature of goods is only discernible upon further inspection, it may be that a buyer could not be expected to have discovered the breach until that inspection occurred. *See id.*

Defendants contend that for two years, Eaton intentionally did *not* declare them in breach or liable for the clutch failures for surreptitious reasons laid out in the Counterclaims. (Doc. No. 86 at 2656.) But this case presents uncertainties akin to those in *Allen.*

Defendants also cite decisions where notice issues were decided as a matter of law, but those cases are inapposite.[4] (*See id.* at 2667-73.)

Regarding the content of the notice: Defendants rely on *Bunn v. Navistar, Inc.*, 797 F. App'x 247, 254 (6th Cir. 2020). (Doc. No. 86 at 2671.) In *Bunn*, the Sixth Circuit recalled some of its prior decisions applying Ohio law. *Bunn*, 797 F. App'x at 254. Those cases reasoned a seller is put on notice under Ohio's Section 1302.65(C)(1) only after he has been informed that his furnishing of defective goods amounts to a breach. *Id.* at 254. *Bunn* involved Tennessee law, so its discussion of Ohio law was *dicta. Id.* More importantly, *Bunn* recognized that Ohio and Tennessee law had evolved differently in their interpretation of the same U.C.C. language. *Id.* The Sixth Circuit noted that *Chemtrol* "reject[ed] the strict reading of the Ohio notice statute in favor of the more relaxed view." *Id.* By contrast, *Bunn* continued—

> Tennessee courts have not recently spoken to this issue. And, although Tennessee may eventually articulate a different interpretation of its notice statute, at this time, we think it appropriate to assume that Tennessee courts would adhere to the traditional view that plaintiffs must allege that they provided notice of a breach (*i.e.*, that the defendant will be asked to meet a claim for

---

[4] Defendants rely on *Eaton Corp. v. Magnavox Co.*, 581 F. Supp. 1514, 1532 (E.D. Mich. 1984), where the court concluded that Eaton did not give adequate notice of breach to a seller. (Doc. No. 86 at 2657, 2670-71.) How Eaton interacted on a transaction thirty-five years ago is not probative of – much less determinative of – the notice issues here.

damages) in commercial cases such as this.

*Id.*  In sum, *Bunn* acknowledged the distinction between the two states' approaches.  *See id.*
*Bunn* thus does not establish Defendants' entitlement to judgment as a matter of Ohio law.  *See
id.*

Regarding the timing of notice: Defendants rely on *Lincoln Elec. Co. v. Technitrol, Inc.*,
718 F. Supp. 2d 876, 883-44 (N.D. Ohio 2021), where a court held that a 15-month delay in
providing notice was unreasonable as a matter of law.  (Doc. No. 86 at 2668, 2672.)  But that
was a case "where the plaintiffs did not provide evidence that their delays were reasonable."
*Johnson v. Eisai, Inc.*, 590 F. Supp. 3d 1053, 1063 (N.D. Ohio 2022) (explaining *Lincoln
Electric*).  Here, Eaton has presented evidence recounting a chronology of events and
interactions with Defendants that it claims operated as "actual, constructive, and inquiry notice
of their breach."  (Doc. No. 78 at 1466-68; Doc. No. 77-2 at 1119-22.)  That evidence and
argument distinguishes this case from *Lincoln Electric.  See Johnson*, 590 F. Supp. 3d. at 1063.
And it gives rise to disputed fact questions.

Although Eaton's motion asserts that notice was provided, Eaton pivots on reply to argue
that notice was not required.  (Doc. No. 84 at 2641.)  Eaton suggests that Section 1302.65 "is
inapplicable here because the express terms of the 2016 Agreement control."  (*Id.*)  Section 7.2
of the Terms and Conditions provides that the Defendants' 'warranties survive acceptance of the
items.'"  (Doc. No. 1-3 at 41.)

The only case cited by Eaton offers little traction for its reply argument.  (Doc. No. 84 at
2641.)  In *Alliance Wall*, the buyer argued on appeal "that the [trial] court erred in ruling that it
did not give the seller timely notice of defects in the goods."  *All. Wall Corp. v. Ampat Midwest
Corp.*, 477 N.E.2d 1206, 1211 (Ohio Ct. App. 1984).  The appellate court was unconvinced,

writing: "Here, the buyer did not notify the seller of any defects for twenty-five days.  With the evidence in this posture, this court is not persuaded that the trial court abused its discretion in finding that the buyer was tardy in asserting its right to reject the goods."  *Id.* at 1212.

There was a general observation in *Alliance Wall* that because the U.C.C. establishes default rules, the parties can draft a contract to deviate from those.  *See id.* at 1211.  But Eaton does not show that the 2016 Agreement expressly eliminated or modified Section 1302.65(C)(1).  (*See* Doc. No. 84 at 2641.)  Nor does Eaton present evidence that the parties even discussed such a modification.  (*See id.*)

Eaton relies on a clause in the 2016 Agreement which said that warranties will survive even after a buyer accepts and takes possession of goods.  (Doc. No. 84 at 2641.)  That clause did no more than allow Eaton to enforce warranties even after accepting a tender of goods.  (Doc. No. 1-3 at 411.)  That did not change the requirement in Ohio law that a buyer must give notice before it files suit on a warranty claim.  (*See id.*)

Case law confirms that the notice rule applies to all of Eaton's claims.  Section 1302.65(C)(1) "applies not only to a breach of contract, but also to breach of an express warranty."  *Jones*, 2001 WL 62513, at *8.  Eaton's breach of supply contract claims against Angstrom and Wrena in Counts One and Two are subject to the notice rule in Section 1302.65(C)(1).  *See generally Lincoln*, 718 F. Supp. 2d 876, 881 (N.D. Ohio 2010).  So, too, is Eaton's express warranty claim in Count Three.  *Id*. at 881, 883; *see also Malkamaki v. Sea Ray Boats, Inc.*, 411 F.Supp.2d 737, 744-45 (N.D. Ohio 2005).  Eaton acknowledges notice is required for these claims.  (Doc. No. 81 at 1693.)

Implied warranty claims are likewise subject to the notice rule of Section 1302.65(C)(1).  *See Diversified Capping Equip., Inc. v. Clinton Pattern Works Inc.*, 2002-Ohio-2295, 2002 WL

17

537998, at *3-4 (Ohio Ct. App. 2002); *Radford v. Daimler Chrysler Corp.*, 168 F. Supp. 2d 751, 754 (N.D. Ohio 2001); *Delorise Brown, M.D., Inc. v. Allio*, 620 N.E.2d 1020, 1022 (Ohio Ct. App. 1993); *Allen*, 507 F. Supp. at 393; 89 A.L.R.5th 319 (2001) (noting that "ordinarily notification is an essential prerequisite to an action on an implied breach of warranty as well as for one on a breach of an express warranty"); *but see McKinney v. Microsoft Corp.*, No. 1:10-cv-354, 2011 WL 13228197, at *6 (S.D. Ohio Sept. 26, 2011).  "Warranties whether express or implied shall be construed as consistent with each other and as cumulative," except where to do so is unreasonable.  Ohio Rev. Code § 1302.30.  Accordingly, all of Eaton's claims are subject to Section 1302.65(C)(1).

Summary judgment is inappropriate where a seller is aware from the buyer of a problem with goods, but their evidence conflicts on whether the buyer told the seller that the problem rose to the level of a breach.  *See Diversified Capping Equip., Inc. v. Clinton Pattern Works Inc.*, No. WD-01-035, 2002 WL 537998, at *4 (Ohio Ct. App. 2002); *see also Builder's Kitchens of Stark Cty., Inc. v. Sibel*, 937 N.E.2d 570, 574 (Ohio Ct. App. 2010).  That is the situation here.  In light of the evidence summarized previously in Section I.B. of this Opinion, there are issues of material fact regarding precisely what was said and understood in the interactions that occurred in 2018 and 2019.

Additionally, the notice issue is further complicated by the parties' competing accusations that the other side intentionally withheld information pertinent to the 147 Levers.

Defendants argue that two internal Eaton studies and reports from 2008 and 2012 were prompted by clutch failures where the levers had fractured along the "hot dog" coined area.  (*See* Doc. No. 83 at 2133-34; Doc. No. 83-11.)[5]  Defendants say that Eaton concealed those incidents

---

[5] Eaton designed the 147 Levers and provided some of the tool and die used to press and punch

and testing results, which Defendants characterize as evidence of a design problem rather than a manufacturing problem.  (*See* Doc. No. 83 at 2133-34.)  Defendants also urge that Eaton's metallurgist recommended ways to revise the design or to fortify the levers.  (*Id.* at 2134.)  Eaton's reply brief does not squarely address those internal reports, which it dismisses as different levers from a different time.  (*See, e.g.*, Doc. No. 84 at 2636-37.)  However, Defendants contend that the reports reveal weaknesses in the 147 Levers' design of which Eaton was aware.  (*See* Doc. No. 83 at 2133-34.)

Eaton insists that Defendants and their vendor Jena Tool changed the tool and die equipment used to make the 147 Levers.  (*See* Doc. No. 81 at 1681.)  This allegedly occurred in January 2016 and January 2017.  (*See id.*; *see also* Doc. No. 81-11 at 1897.)  Eaton says it was not informed of what it now says were departures from the approved tooling and techniques.  (Doc. No. 81 at 1692.)  Defendants rejoin that they and Jena only made tooling revisions that Eaton directed.  (Doc. No. 83 at 2139.)  Defendants accuse Eaton and its expert of distorting emails that merely reference an earlier Eaton-approved tooling change.  (*Id.*)  These competing accusations of concealed facts bear on the notice issue because they go to the parties' respective knowledge.

The issue of notice in this case is replete with material fact disputes.  Whether Eaton's written and oral communications sufficed to constitute timely, reasonable notice is a fact issue for the jury.  For the reasons above, Eaton's and Defendants' respective Rule 56 motions on Counts One through Four of Eaton's Complaint are denied.

---

those metal parts.  (Doc. No. 41 at 300-01, ¶¶ 4-8; Doc. No. 83-10 at 2239.)

## C.     Count Five of Eaton's Complaint

Eaton asks this Court to grant partial summary judgment as to Defendants' liability for breach of the implied warranty of fitness for a particular purpose.  (Doc. No. 81 at 1697-98.) Rule 56(a) requires the Court to consider whether Eaton has shown its entitlement to judgment as a matter of law.  That requires a determination of whether the implied warranty applies in these circumstances.  *See generally Caterpillar Fin. Servs. Corp. v. Harold Tatman & Son's Ents., Inc.*, 50 N.E.3d 955, 960, 962 (Ohio Ct. App. 2015).

The Ohio Commercial Code provides: "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified . . . an implied warranty that the goods shall be fit for such purpose."  Ohio Rev. Code § 1302.28.  "The heart of the concept is the justifiable reliance by the buyer on the seller's skill or judgment in providing goods for the buyer's special needs."  *Action Group, Inc. v. NanoStatics Corp.*, 2013-Ohio-5542, 2013 WL 6708395, at *11 (Ohio Ct. App. 2013) (quoting Hawkland & Rusch, Uniform Commercial Code Series, Section 2-315:1).

The required elements to enforce this warranty are: "(1) the seller has reason to know the buyer's particular purpose; (2) the seller has reason to know that the buyer is relying on the seller's skill or judgment to furnish appropriate goods; and (3) the buyer must, in fact, rely upon the seller's skill or judgment."  *W.H.C., Inc. v. Interlake Chemicals, LTD*, 549 F. Supp. 3d 723, 729 (N.D. Ohio 2021) (quoting *Leen v. Wright Med. Tech., Inc.*, No. 3:15-cv-125, 2015 WL 5545064, at *2 (S.D. Ohio Sept. 18, 2015)).

> The existence of an implied warranty of fitness for a particular purpose is contingent on two general facts.  First, the seller must be aware at the time of contracting of a particular purpose for which the buyer intends to use the goods. Second, the buyer must rely on the seller's skill or judgment to select or furnish

goods suitable for that particular purpose.

*Price Bros. Co. v. Philadelphia Gear Corp.*, 649 F.2d 416, 423 (6th Cir. 1981).  "Unlike an

implied warranty of merchantability, an implied warranty of fitness for a particular purpose

depends upon communication between the buyer and seller regarding a specific transaction."

67A Am. Jur. 2d Sales § 668.  It also requires proof of a buyer's reliance, and so "the implied

warranty of fitness for a particular purpose is more difficult to establish than the implied

warranty of merchantability."  *Id.*

     "[U]nder the settled rule in Ohio . . . where the subject-matter involved in the contract is

known, definite, and described, there is no such implied warranty of fitness for any particular

purpose."  *Steel Sanitary Co. v. Pangborn Corp.*, 175 N.E. 615, 617 (Ohio Ct. App. 1930).

"When a buyer gives precise and complete specifications to the seller, the warranty of fitness for

a particular purpose does not normally arise.  In that situation, the buyer eschews reliance on the

seller's skill or judgment to furnish the appropriate goods and, instead, requires the seller to

follow the buyer's own judgment regarding what goods would best serve its purposes."  *Action

Group*, 2013 WL 6708395, at *11 (citations omitted).

     Like in *Price Brothers,* here "the parties' skill and knowledge in matters relating to their

transaction were essentially equal.  They contracted for the sale of components to be installed in

a highly complex piece of machinery."  649 F.2d at 424.  "[B]oth parties to [the] contract are

merchants who are on equal footing with respect to the subject matter of their transactions, and

their sales agreement [was] reduced to a writing that specifies technical requirements for the

goods sold."  *Id.* at 423.

Reliance in *Price Brothers* was foreclosed by the buyer's high degree of specificity in its order documentation and the buyer's high degree of knowledge regarding the mechanical requirements of its machine – into which the seller's component was installed.

> Price Brothers ordered components from Philadelphia Gear by use of a purchase order specifying performance criteria.  It is of no avail to Price Brothers that Philadelphia Gear may have assisted Price Brothers in arriving at these specifications.  The fact that the specifications were jointly arrived at by Price Brothers engineers and Philadelphia Gear representatives only emphasizes the fact that Price Brothers exercised its own judgment in selecting the components ordered and did not rely on Philadelphia Gear to supply components.

*Id.* at 423-24.

> [T]he implied warranty of fitness . . . is not readily applicable when the buyer enjoys skill or knowledge equal to that of the seller. . . . [Buyer] was well acquainted with its own particular needs, and while [buyer] might properly seek consultation with [seller] regarding [seller's] components, it would be unreasonable for [buyer] to completely defer judgment to [seller] to select components for inclusion in [buyer's] unique equipment.  The facts of [buyer's] knowledge and skill and the specific purchase order make actual reliance by [buyer] on [seller] so unlikely that a finding of such reliance would be clearly erroneous.  Therefore, no warranty of fitness for a particular purpose arose from the sales transaction in this case . . . .

*Id.* at 424 (citations omitted).

Eaton's own pleadings, admissions, evidence, and arguments show its knowledge, experience, involvement, and control with respect to the 147 Levers.  The Court has reviewed the exhibits submitted by both sides with their motions, oppositions, and replies.  The record is both vast and consistent with respect to Eaton's detailed knowledge about the 147 Levers.  Eaton's vantage point was considerably more informed and immersed than Price Brothers' understanding of the component made by Philadelphia Gear.[6]

---

[6] Like Eaton, Price Brothers was a buyer familiar with particulars about the component it needed. *Price Brothers*, 649 F.2d at 421 (the parts were for Price Brothers' self-designed pipe-wrapping machinery).  But as to those particular components, the seller Philadelphia Gear created the design for the parts.  *Id.*  Here, Eaton designed the 147 Levers and itself originally manufactured

Rather than relying on Defendants to conceive of a suitable lever, Eaton in its own words explains that it —

> repeatedly and explicitly informed Defendants in contracts, drawings, written specifications, computer models, and other communications that a critical bend in the lever must be "full round"; that is, it needed to be circular and avoid any sharp corners or jagged edges. Only levers with a "full round" bend could withstand the forces necessary to shift gears without breaking. Defendants understood the importance of the "full round" directive: for years, they supplied levers with the requisite shape that functioned properly.

(Doc. No. 1 at 1, ¶ 2; *see also id.* at 7-8 ¶¶ 32-35.) "Eaton requires adherence to detailed specifications, drawings, models, and approved samples." (*Id.* at 5, ¶ 19.) Eaton's "Terms and Conditions also prohibit Defendants from altering the lever's design or the manufacturing process unless they obtained Eaton's prior written approval." (*Id.* at 7, ¶ 30.) The basis for Eaton's lawsuit is that "Defendants' levers: (1) did not conform to Eaton's specifications and drawings . . . [and] (2) did not conform to the CAD model provided by Eaton . . . ." (*Id.* at 18. ¶ 93.)

Notably, Eaton was the manufacturer of 147 Levers until 2005, when that part production was outsourced to Wrena. (Doc. No. 42 at 316, ¶ 3.) At that time, Eaton received sample 147 Levers, which it approved. (*Id.* at 316, ¶ 6.) This was part of a production part approval process (PPAP). (Doc. No. 41 at 301, ¶ 7; Doc. No. 42 at 316, ¶ 7.) Eaton agreed to a control plan for quality checks going forward in Defendants' manufacturing process for those levers. (Doc. No. 42 at 316, ¶ 5.) "Eaton admits that it knew the uses, applications, and characteristics of the [147] Lever." (*Id.* at 318, ¶ 33.)

---

those parts. (Doc. No. 42 at 316, ¶ 3.) In addition, in *Price Brothers*, the written contract included nothing more than the purchase order and acknowledgment. 649 F.2d at 422. Here, Eaton bargained for knowledge rights and controls regarding the design and manufacture of the 147 Levers. (*E.g.*, Doc. No. 1-3 at 41-42.)

A new drawing for the 147 Lever called Revision AE was prepared in 2014.  (*Id.* at 317, ¶ 24.)  A PPAP was conducted for this new version of the 147 Lever, which Eaton approved. (Doc. No. 41 at 302, ¶¶ 24-25; Doc. No. 42 at 317, at ¶ 24-25.)  Eaton admits the Revision AE design drawing document "speaks for itself."  (Doc. No. 41 at 303, ¶¶ 29-33; Doc. No. 42 at 318, ¶ 30.)  The Revision AE design drawing on its face indicates that it comes from Eaton's Clutch Business Unit.  (*See* Doc. Nos. 82-6, 83-4; Doc. No. 1 at 7, ¶¶ 32-33.)  Eaton's summary judgment papers confirm that the Revision AE drawing came from Eaton and was provided to Defendants.  (Doc. No. 77-2 at 1117-18; Doc. No. 81-6.)

Accordingly, Eaton cannot plausibly assert or prove reasonable reliance on any of the following:

- Defendants' expertise regarding the design of the 147 Lever.  Eaton *was* the designer.  (Doc. No. 41 at 300; Doc. No. 42 at 316.)

- Defendants' expertise regarding the manufacture of 147 Levers.  Eaton itself had been the manufacturer of that same part.  (Doc. No. 41 at 300; Doc. No. 42 at 316.)

- Defendants' assurances or descriptions about how stamped levers would come out.  Eaton required Defendants to conduct manufacturing trial runs and to present samples.  (Doc. No. 41 at 300; Doc. No. 42 at 316.)  Eaton could inspect, test, and approve those samples – which it admittedly did.  (Doc. No. 41 at 300; Doc. No. 42 at 316.)

- Defendants' tooling used to stamp or punch the levers.  In 2005, Eaton provided tooling for the 147 Levers that Defendants were to use or replicate.  (Doc. No. 41 at 300; Doc. No. 42 at 316.)  Eaton approved the control plan.  (*See id.*)  Eaton also had contractual rights of inquiry and control over special tooling used for 147 Levers.  (*See, e.g.*, Doc. No. 1-1 at 27, § 8.1; Doc. No. 1-3 at 41, § 10.)

- Defendants' quality testing going forward.  Eaton's personnel could (and did) conduct K1 testing of lever shipments.  (Doc. No. 83 at 2128-33.)

In light of the above, it is clear that the implied warranty of fitness for a particular purpose did *not* arise in 2005 when this supplier relationship began.  (*See* Doc. No. 42 at 316.)

What then followed was many years of production of 147 Levers by Defendants.  That is many years during which Eaton could voice questions or concerns, inspect the levers, tour Defendants' facilities, etc.  With the benefit of many years of experience working with Defendants and their 147 Levers, Eaton participated in a design change for the 147 Lever.  (Doc. No. 42 at 317.) Eaton itself prepared the technical drawing adopted as the new design, called "Revision AE." (Doc. No. 77-2 at 1117-18; Doc. No. 81-6.)  The parties conducted another PPAP for 147 Levers using the Revision AE design.  (Doc. No. 41 at 302; Doc. No. 42 at 317.)  Samples were given to Eaton for inspection and testing.  (Doc. No. 41 at 300, 302; Doc. No. 42 at 316-17.)  Eaton approved these new-design 147 Levers.  (Doc. No. 41 at 302; Doc. No. 42 at 317.)  These events are undisputed.

The record thus confirms Eaton's substantial involvement, expertise, accumulated experience, and contractual controls.  This includes technical details of product design and production methods.  It was with that background and accumulated information that the parties negotiated and signed their updated contract in 2016.

As a matter of law, the implied warranty of fitness for a particular purpose did not arise. The level of detail in the parties' communications, contract terms, and specifications regarding the goods leaves no place for that implied term.  A jury could not find either actual or reasonable reliance by Eaton upon Defendants' knowledge and skill to select and furnish suitable levers. Given the detailed product descriptions, as well as the knowledge, expertise, and involvement of Eaton, the implied warranty did not apply to this transaction.

Again, Eaton itself moved for summary judgment on the question of liability under Count Five.  (Doc. No. 81 at 1696.)  Defendants responded with evidence and argument to show why that implied warranty is inapplicable.  (Doc. No. 83 at 2143.)  Defendants invoked *Steel Sanitary*

25

and *Price Brothers* (previously discussed).  (*Id.* at 43.)  Eaton then replied to Defendants' points and submissions.  (Doc. No. 86 at 2636.)

> Entering a judgment when there has been a motion but no cross-motion is somewhat different from the situation in which neither party has moved under Rule 56 and the court wishes to act sua sponte.  When there has been a motion but no cross-motion, the judge already is engaged in determining whether a genuine dispute as to material fact exists and the parties have been given an opportunity to present evidence designed either to support or refute the request for the entry of judgment.

Wright & Miller, 10A Fed. Prac. & Proc. Civ. § 2720.1 (4th ed.).  "[T]he weight of authority is that summary judgment may be rendered in favor of the opposing party even though the opponent has made no formal cross-motion under Rule 56."  *Id.* (collecting authorities).

For completeness, the Court has considered the factors and prudential considerations described by the Sixth Circuit in *Excel Energy, Inc. v. Cannelton Sales Co.*, 246 F. App'x 953, 959-60 (6th Cir. 2007), which confirm why entry of judgment on Count Five is proper.  Eaton was twice put on notice of the need to come forward with its arguments and evidence.  First, when Eaton moved for judgment on its claim, longstanding Sixth Circuit precedent put Eaton on notice "that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.'"  *Surles*, 678 F.3d at 455-56 (quoting *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001)).  Second, Defendants argued why Count Five fails under the legal doctrines in *Steel Sanitary* and *Price Brothers.*  (Doc. No. 83 at 2143.)

For the reasons above, judgment is entered in favor of Defendants on Count Five of Eaton's Complaint.

### D.      Defendants' Counterclaims

Eaton moves for summary judgment on each of Defendants' Counterclaims.  (Doc. No. 81.)

### 1.      Counterclaim One

In Counterclaim One, Defendants urge that Eaton intentionally concealed matters and misled Defendants while negotiating and making the 2019 Agreement.  (Doc. No. 41 at 309-10.)

> An Ohio plaintiff claiming fraudulent inducement to enter into a contract "must adduce evidence of (1) a false representation concerning a fact or, in the face of a duty to disclose, concealment of a fact, material to the transaction; (2) knowledge of the falsity of the representation or utter disregard for its truthfulness; (3) an intent to induce reliance on the representation; (4) justifiable reliance upon the representation under circumstances manifesting a right to rely; and (5) injury proximately caused by the reliance."

*McCarthy v. Ameritech Pub., Inc.*, 763 F.3d 469, 478 (6th Cir. 2014) (quoting *Metro. Life Ins. Co. v. Triskett Ill., Inc.*, 646 N.E.2d 528, 532 (Ohio Ct. App. 1994)).  The Sixth Circuit acknowledged that there are particular circumstances where "silence is sufficient to give rise to a claim for fraudulent inducement." *Id.* at 480.  Fraudulent inducement must be proven by clear and convincing evidence.  *Mesmer v. Johnson*, 122 N.E.2d 711, 713 (Ohio Ct. App. 1954); *see also Mid-America Tire, Inc. v. PTZ Trading Ltd.*, 768 N.E.2d 619, 628 (Ohio 2002).

Eaton argues that Defendants' Counterclaim is belied by Section 11.5 of the 2019 Agreement.  (Doc. No. 84 at 2642.)  It says the written contract "shall constitute the entire agreement between the Supplier and Buyer hereto with respect to the subject matter hereof and shall supersede all previous negotiations, understandings, agreements, commitments and writings with respect to such subject matter."  (Doc. No. 77-25 at 1408.)

Eaton insists that any "alleged assurances are barred by the parol evidence rule, as the 2019 Agreement is fully integrated."  (Doc. No. 84 at 2642.)  But the Ohio Supreme Court

rejects that sort of argument.  "Fraud cannot be merged[.]  * * *  Thus, the presence of an integration provision does not vitiate the principle that parol evidence is admissible to prove fraud."  *Galmish v. Cicchini*, 734 N.E.2d 782, 789-90 (Ohio 2000).

However, this fraud exception is itself subject to an exception.  A party may not make "a fraudulent inducement claim which alleges that the inducement to sign the writing was a promise, the terms of which are directly contradicted by the signed writing.  Accordingly, an oral agreement cannot be enforced in preference to a signed writing which pertains to exactly the same subject matter, yet has different terms."  *Id.* at 790 (quoting *Marion Prod. Credit Assn. v. Cochran*, 533 N.E.2d 325, syllabus ¶ 3 (Ohio 1988)).

On March 27, 2019, the parties executed a new contract which became effective a few days later on April 1st.  (Doc. No. 77-25 at 1404, 1408.)  Section 10.1 provided: "The execution of this Agreement shall in no way impact any potential claims of either Party which may exist or have existed" under the 2016 Agreement.  Section 10.1 expressly preserved the "Warranty, Indemnity, Insurance, Tooling . . . and Remedies" provisions from the 2016 Agreement.  (*Id.* at 1407.)

Defendants say that when the 2019 Agreement was signed, they were under the impression that Eaton was not pursuing a claim for breach of contract or warranty for the 147 Levers.  (Doc. No. 83 at 2150-52.)  Defendants argue that Eaton fostered this belief through its actions, statements, and material omissions.[7]  (*Id.*)

---

[7] The Sixth Circuit acknowledges that, in certain limited circumstances, "silence is sufficient to give rise to a claim for fraudulent inducement."  *McCarthy*, 763 F.3d at 480.  "Ohio law imposes a duty to disclose material information when one party has information that the other [party] is entitled to know because of a fiduciary *or other similar relation of trust and confidence between them.*"  *Id.* (emphasis in original; quotations omitted).  Citing the Restatement (Second) of Torts § 551(2)(c) (1977), the Sixth Circuit indicated that a party to a business transaction must disclose subsequently acquired information that he knows will make untrue or misleading a previous

Defendants also say that Eaton expressly advised that they were *not* at fault for the clutch failures.  (*Id.* at 2151.)  For example, Defendant's Vice President of Sales and Engineering recounts in an affidavit that during a November 2018 telephone call among the parties' executives, Eaton's Peter Denk told Defendants' officers not to worry about the recall, which he said was not Wrena's fault.  (Doc. 83-2 at 2192.)

Defendants submitted evidence of Eaton internal communications.  (Doc. No. 69-17.)  As reviewed below, those communications indicate the opposite understanding and agenda. Internally, these exhibits indicate that Eaton blamed Defendants, planned to debit their account to recover costs, and expected litigation.

On August 9, 2018, a member of Eaton's clutch division emailed a colleague and asked for direction on whether to debit the Wrena account to recover costs related to 147 Levers.  (*Id.* at 964.)

> I think we all need your input on this. This concerns the debit recovery for the 173C147 lever issue we had w/ Wrena.  The DMR was not withdrawn as I did not receive any definitive direction that it needed to be . . . .
>
> How should we proceed?  Should the DMR be withdrawn?  Should the SSC Team continue to hold on and not debit the supplier?  Should they proceed w/ the debit of the supplier?  The last bit of information that I received was that Eaton was taking this matter through litigation (not sure if this is accurate), but from the perspectives of the plant and the SSC Team, what needs to be done? I'd appreciate your input on this matter.

(*Id.*)  An Eaton manager responded:

> As it stands right now this issue is still being reviewed with Peter Denk on best course of action.  I would keep the DMR in place as this will eventually be the catalyst for future debit to the supplier.  This will most certainly go to litigation and the situation is still very sensitive so please do not proceed with the debit until decisions are made at levels much higher than me.

(*Id.* at 963.)  Later that day, an Eaton director emailed back and instructed to schedule a meeting

---

representation that when made was true or believed to be so.  *Id.*

with Wrena for the following week: "we plan to bring Wrena in and highlight the fact that we expect them to pay for the warranty issue." (*Id.* at 962.)  The director's email indicates that he met with Denk that day to apprise him of that "planned course of action." (*Id.*)

Defendants' evidentiary submissions reveal genuine fact disputes whether Sections 10.1 and 11.5 rule out the inducement claim here.  Importantly, these factual disputes are also material to the merits of Counterclaim One: whether Eaton made a misrepresentation or materially misleading statement; and whether circumstances obliged Eaton to correct a prior statement or to disabuse Defendants of a misimpression that Eaton earlier may have foreclosed.  Neither side developed legal or factual arguments sufficient to resolve Counterclaim One.

For the reasons above, Eaton's motion as to Counterclaim One is denied.

### 2. Counterclaims Two and Three

In Counterclaim Two, Defendants refer to sections of the 2016 Agreement that obligated Eaton to purchase exclusively from Angstrom certain products until 2020 or 2021.  (Doc. No. 41 at 310-11.)  Defendants contend that Eaton breached that contract in early 2019 by prematurely resourcing a roller yoke part to a supplier in India.  (*Id.* at 308.)  In Counterclaim Three, Defendants say that Eaton never genuinely provided them with an opportunity to quote and win additional business as required in Section 7 of that contract.  (*Id.* at 311-12.)

Eaton moves for summary judgment on the ground that Counterclaims Two and Three are barred by the release of claims that Defendants provided in Section 10.1 of the 2019 Agreement.  (Doc. No. 81 at 1700-01.)  Section 10.1 provides in pertinent part:

> The execution of this Agreement shall in no way impact any potential claims of either Party which may exist or have existed under the August 2016 Master Purchase Agreement between Buyer and Supplier (hereinafter the "2016 Agreement"), except that any claims of Supplier for lost profits and/or obsolescence under the 2016 Agreement are extinguished in exchange for the price increases reflected herein.

(Doc. No. 77-25 at 1407.)  That section expressly preserves claims under the 2016 contract related to, *inter alia,* "Transition of Supply" and "Remedies."  (*Id.*)

In Ohio, "[a] release of a cause of action for damages is ordinarily an absolute bar to a later action on any claim encompassed within the release."  *Walgreen Co. v. Hummer*, No. 1:10-cv-2902, 2012 WL 1658680, at *4 (N.D. Ohio May 11, 2012) (quoting *Haller v. Borror Corp.*, 552 N.E.2d 207 (Ohio 1990)).  Eaton moves for summary judgment solely based on the face of Section 10.1.  (Doc. No. 81 at 1700-01.)

On the legal front, Section 10.1 is titled "Retention of *Potential* Claims."  (Doc. No. 77-25 at 1407 (emphasis added).)  Suffice to say, that is an odd heading for a clause that Eaton treats as an absolute release of claims.  Retaining claims is practically the opposite of releasing claims.  To be enforceable, a release must be expressed in terms that are clear and unequivocal.  *Geczi v. Lifetime Fitness*, 973 N.E.2d 801, 805 (Ohio Ct. App. 2012).  In *Brown v. Columbus All-Breed Training Club*, 789 N.E.2d 648 (Ohio Ct. App. 2003), the court held that a release defense could not be resolved on summary judgment because of a disparity between a release clause's title and the language within that clause.  *Id.* at 563.

Here, the issue is more complicated than in *Brown* because the uncertainty on the face of the contract does not come solely from the title of Section 10.1.  *See id.*  The body of that clause also leaves potential room for competing interpretations.  If Counterclaims Two and Three fit into the description(s) of either "Transition of Supply" or "Remedies" under the 2016 Agreement, Section 10.1 of the 2019 Agreement would preserve this counterclaim: "For the avoidance of doubt, the obligations and remedies of the following clauses from the 2016 Agreement and any terms referenced therein shall survive termination/expiration: . . . Transition of Supply, and Remedies."  (Doc. No. 77-25 at 1407.)

If the language of a contract is reasonably susceptible to more than one interpretation, the meaning of ambiguous language is a question of fact to be determined by a jury. *Geczi*, 973 N.E.2d at 805 (collecting authorities). The parties have not grappled with either the presence or absence of intrinsic ambiguity within Section 10.1. In any event, Defendants have put forward evidence and argument suggesting either an extrinsic ambiguity or the lack of a meeting of the minds as to Section 10.1. (*See* Doc. No. 83 at 2150-52.) Thus, Eaton's entitlement to judgment as a matter of law on this counterclaim is not yet clearly established – even putting aside fraudulent inducement.

On the other hand, Defendants will not be entitled to recover (under Counterclaims One or Two) unless they tender back the fruits of any contract or release that they seek to rescind. "A releasor . . . may not attack the validity of a release for fraud in the inducement unless he first tenders back the consideration he received for making the release." *Talmer Bank & Tr. v. Malek*, 651 F. App'x 438, 442 (6th Cir. 2016) (quoting *Berry v. Javitch, Block & Rathbone, L.L.P.*, 940 N.E.2d 1265, 1270 (Ohio 2010)) (cleaned up).

> At common law, generally, a party who has been fraudulently induced to enter into a contract has the option of rescinding the contract or retaining the contract and suing for damages based upon the tort of fraudulent inducement. An election is imposed because it is inconsistent to allow the defrauded party to rescind the contract and yet at the same time receive the benefits of the contract. In other words, the contract is voidable at the option of the defrauded party.

*Mid-Am. Acceptance Co. v. Lightle*, 579 N.E.2d 721, 727 (Ohio Ct. App. 1989) (citations omitted); *see also Jack Mann Chevrolet Co. v. Assocs. Inv. Co.*, 125 F.2d 778, 784 (6th Cir. 1942). The parties' submissions do not resolve fact questions on whether Defendants tendered (or before trial wish to remit back) any consideration or fruits of the 2019 Agreement.

For the reasons above, Eaton's motion as to Counterclaims Two and Three is denied.

### 3.    Counterclaim Four

In Counterclaim Four, Defendants seek a judgment declaring the 147 Levers supplied to Eaton complied with all specifications and that Defendants have not breached any supply contract with Eaton.  (Doc. No. 41 at 313.)  In other words, Defendants seek a declaration that their affirmative or other defenses to Eaton's claims are successful.  (*See id.*)  Defendants also seek a declaratory judgment excusing their further performance obligations under the 2016 and/or 2019 contracts to supply the Subject Lever.  (*Id.*)  In other words, Defendants seek a declaration of the remedy that they requested in Counterclaims One and Two.  (*See id.*)

This Court has substantial discretion in deciding whether to hear declaratory judgment actions.  *U.S. Fire Ins. Co. v. Albex Aluminum, Inc.*, 161 F. App'x 562, 563 (6th Cir. 2006) (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995)).  In exercising this discretion, trial courts in the Sixth Circuit consider five factors: (1) whether the judgment would settle the controversy; (2) whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue; (3) whether the declaratory remedy is being used merely for the purpose of procedural fencing or to provide an arena for a race for res judicata; (4) whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction; and (5) whether there is an alternative remedy that is better or more effective.  *Id.* at 564 (quoting *Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984)).

Applying these factors, the Court concludes that the first, second, and fifth factors weigh against exercising discretion to resolve Counterclaim Four.[8]  Declaratory relief depends entirely on the outcome of other claims and counterclaims.   The Court is not convinced that

---

[8] The third and fourth factors do not pertain to the circumstances here.

Counterclaim Four adds anything to the relief that otherwise could be available for the Counterclaims or could be precluded for Eaton's claims. Defendants therefore have not put forward a persuasive argument for declaratory relief. The mere possibility of a future lawsuit against Defendants related to clutch failures is speculative.

Accordingly, the Court declines to exercise discretion over Counterclaim Four. That counterclaim is dismissed, and Eaton's motion for summary judgment as to Counterclaim Four is denied as moot.

### E.    Defendants' Rule 12(c) Motion

Defendants also moved for judgment on the pleadings as to each of Eaton's claims. (Doc. No. 86.) They contend that Eaton failed to allege notice for its contract and warranty claims. (*Id.* at 2667.)

### 1.    Standard of Review

"The standard of review for a Rule 12(c) motion is the same as for a motion under Rule 12(b)(6) for failure to state a claim upon which relief can be granted." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010). "[T]he inquiry on a motion to dismiss is not whether Plaintiff will be successful on the merits, but simply whether her pleadings are sufficient to state a claim upon which relief can be granted." *Id.* at 726. "To state a valid claim, a complaint must contain direct or inferential allegations respecting all the material elements under some viable legal theory." *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007).

"For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *JPMorgan Chase*

*Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007) (quoting *S. Ohio Bank v. Merrill Lynch,*

*Pierce, Fenner & Smith, Inc.*, 479 F.2d 478, 480 (6th Cir. 1973)).  "[W]hen a complaint

adequately states a claim, it may not be dismissed based on a district court's assessment that the

plaintiff will fail to find evidentiary support for his allegations or prove his claim to the

satisfaction of the factfinder."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007).

The function of the Court in ruling on such a motion is not to weigh the evidence nor to appraise

the credibility of witnesses.  *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995).

Documents fairly construed as exhibits to the pleadings or public records subject to

judicial notice are permissible terrain when resolving a Rule 12(c) motion.  *Briggs v. Hogan*, No.

21-5581, 2022 WL 985825, at *2 (6th Cir. Apr. 1, 2022); *see also Commercial Money Ctr*, 508

F.3d at 335-36 ("[D]ocuments attached to the pleadings become part of the pleadings and may be

considered on a motion to dismiss.  In addition, when a document is referred to in the pleadings

and is integral to the claims, it may be considered without converting a motion to dismiss into

one for summary judgment.") (citation omitted).  But the Court may not consider additional

evidence *outside* the pleadings – without converting the motion to one for summary judgment

under Rule 56.  *See* Fed. R. Civ. P. 12(d).

## 2.    Analysis

Defendants argue that Eaton's complaint "failed to plead that it provided Wrena with

notice of its breach of warranty claim."  (Doc. No. 86 at 2653.)  It is true, as Defendants point

out, that courts have held "[i]f a plaintiff fails to plead pre-litigation notice, her breach of

warranty claim must be dismissed."  *St. Clair v. Kroger Co.*, 581 F. Supp. 2d 896, 902 (N.D.

Ohio 2008).  But there is a difference between failing to plead anything regarding notice and the

precision or completeness of what a plaintiff *does* allege.

Here, Eaton's Complaint includes the following allegations:

48.  On February 5, 2018, Eaton issued a Defective Material Report ("DMR") for Defendants' faulty levers.  Eaton re-issued the DMR on May 1, 2018 after additional testing.

49.  The May 2018 DMR stated that the clutch lever lacked material transition in the hotdog because the lever's radii were not blended pursuant to Eaton's print specifications.

50.  In response to the DMR, Wrena advised Eaton that it would revise its control plan (which documents the functional elements of quality control that must be implemented to assure quality standards are met) to include inspections of the hotdogs and to test three levers per hour using a radius gage.

    *  *  *

56.  During its analysis and investigation of the failures, Eaton regularly communicated its findings to Defendants verbally, in writing and in person. Eaton specifically informed Defendants in 2018 that the ECA clutch malfunctions were attributable to levers that Defendants manufactured outside of specifications.

57.  Upon information and belief, once Eaton discovered the source of the lever failures in mid-2018 and communicated its conclusions to Defendants, Defendants immediately reinstated their previous manufacturing and maintenance procedures, which enabled Defendants to once again produce levers with "full round" hotdogs.

58.  Eaton attempted to convene various meetings with Defendants to discuss why the levers failed.  Defendants delayed, cancelled, or truncated these meetings.  Moreover, despite repeated good faith requests, Defendants refused to share maintenance records for its tools and other relevant documentation.

(Doc. No. 1 at 10-12.)

"For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true . . . ." *Winget*, 510 F.3d at 581 (quoting *Fenner & Smith, Inc.*, 479 F.2d at 480).  So, for purposes of this Rule 12 motion, it is presumed true that "Eaton regularly communicated its findings to Defendants verbally, in writing and in person [and] specifically informed Defendants in 2018 that the ECA clutch

malfunctions were attributable to levers that Defendants manufactured outside of specifications." (Doc. No. 1 at 12, ¶ 56.)

These allegations satisfy the pleading requirement that follows from Section 1302.65(C)(1). *Cf. Galoski v. Stanley Black & Decker, Inc.*, No. 1:14-cv-553, 2014 WL 4064016, at *6 (N.D. Ohio Aug. 14, 2014). To the extent Defendants argue that communications from Eaton "are insufficient because they do not mention a breach of contract . . . [that] argument misstates Ohio law, under which notice may be sufficient even without using the phrase 'breach of contract.'" *Coupled Prod.*, 2014 WL 293659, at *11.

There is a second problem with the request for relief under Rule 12(c) in Defendants' motion. The motion is accompanied by twenty-five exhibits that bear directly on the issue of notice. (Doc. Nos. 69-1-69-25, 86; *see also* 8/23/2023 Non-Document Order.) This Court may not grant a Rule 12 motion accompanied by evidentiary material outside the pleading. *See Max Arnold & Sons, LLC v. W.L. Hailey & Co.*, 452 F.3d 494, 503-04 (6th Cir. 2006). To grant relief on the pleadings, this Court would have to exclude evidentiary exhibits.[9] *See id.*

For the reasons above, Defendants' Rule 12(c) motion is denied.

## III.    Conclusion

For the reasons above, Eaton's Motion for Summary Judgment on Counts One through Five of the Complaint is DENIED. Eaton's Motion for Summary Judgment on Defendants' Counterclaim Four is GRANTED and otherwise DENIED. Defendants' Motion for Summary

---

[9] The Court recognizes that there could be circumstances where a consolidated Rule 12(c) motion and Rule 56 motion may be permissible – such as where those motions address different claims or rely on distinct grounds. But here, Defendants' Rule 12(c) motion and Rule 56 motion address the same claims and are both predicated on Section 1302.65(C)(1).

Judgment is DENIED, but for the reasons stated herein, Count Five is summarily dismissed.

Additionally, Defendants' Rule 12(c) motion is DENIED.

**IT IS SO ORDERED.**

_____

BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE

**Date**: January 30, 2024

38